Jeffrey C. Ruderman (JR-7812)
Cyruli Shanks Hart & Zizmor, LLP
Attorney for Defendants Team
Gowanus LLP, Peter Moore, Peter
Kovacs and John Sutter
420 Lexington Avenue Suite 2320
New York, NY 10170
(212) 661-6800
Fax (212) 661-5350
jruderman@cshzlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
UNITED CENTRAL BANK, successor by acquisition
to Mutual Bank,

                             Plaintiff,

        -against-

TEAM GOWANUS, LLC, SQUARE ONE
HOLDING CORP., PETER MOORE, PETER
KOVACS, JOHN SUTTER, BEN HANSEN
ARCHITECT LLC, ENVIRONMENTAL CONTROL
BOARD OF THE CITY OF NEW YORK, "JOHN DOE"
#1-10, "MARY DOE" #1-10 AND "JANE DOE",

                            Defendants.
-------------------------------------------------------------------x

Case No. 10-CV-3850(ERK)(VVP)

AFFIDAVIT OF JOHN SUTTER IN
OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

STATE OF NEW YORK)
NEW YORK COUNTY)

JOHN SUTTER, being duly sworn, deposes and states:

      1.     I am one of the Managers of defendant Team Gowanus, LLC ("Team Gowanus")

and one of individual defendants, and as such, I am fully familiar with the facts and

circumstances of this matter.

      2.     I submit this affidavit in opposition to plaintiff United Central Bank's ("UCB")

motion for summary judgment pursuant to FRCP 56.

3.      UCB is not entitled to summary judgment against as there material issues of fact that require a trial of this action. Further, UCB has prematurely filed the instant motion, prior to any depositions. Such depositions are necessary to determine certain unknown facts which may support the defenses of Team Gowanus and the other Defendants.

4.      This action arises from a loan made to Team Gowanus in connection with the purchase of the property located at 68-92 Third Street in Brooklyn (the "Property"). Team Gowanus is a New York limited liability company which was formed for the sole purpose of purchasing the Property in order to convert it to commercial office space, art and production studios, galleries, and potentially a small café. (the "Project"). The members of Team Gowanus consisted of Me, defendant Peter Moore ("Moore") and defendant Peter Kovacs ("Kovacs") and the majority members and number of minority members. During the real estate boom of the mid-2000's Moore was a very successful real estate developer in New York, mostly concentrating on condominium/hotel conversion/construction in lower Manhattan.

5.      While Moore had amassed substantial equity in his various projects through the years, he was highly leveraged with few liquid assets. He capitalized his projects with some of his own capital, but much of the funds coming from other investors and financing.

6.      While I had some interests in the occasional real estate transaction, none of the other members were in the real estate development business at all. They comprised mostly artists who sought a way to own as small art studio or commercial condo.

7.      Team Gowanus was structured that I, Moore and Kovacs had the greatest membership interest in Team Gowanus and the minority members had interests ranging from 1.47% to 3.58%. (Exhibit "Defendants" to Aff of Hoholik)

8.     The Property was purchased from defendant Square One Holding Corp. ("Square One") for $12,500,000.00.  The closing took place on May 1, 2008. The purchase price was paid by a combination of membership capital, lender financing and seller financing.  The lender financing, in the amount of $9,000,000.00 was provided by Mutual Bank and Square One "took back" a mortgage of $2,250,000.00.  The loan from Mutual Bank was for a one year term which was to mature on May 1, 2009 and provided for payments of interest only during the term at 8% annually (the "Loan").  The Loan was funded less an interest reserve from which the interest for the year was to be paid.

9.     In connection with the Loan, Team Gowanus signed a note (the "Note"), mortgage (the "Mortgage") and loan agreement (the "Loan Agreement") and I and the other members of Team Gowanus each executed guarantees limited to a specific percentage of the Loan (the "Guarantees" and each a "Guarantee") (collectively the "Loan Documents").  Pursuant to the Guarantees, Moore had guaranteed 50% of the Loan, Kovacs guaranteed 31.81% of the Loan, I guaranteed 28.18% of the Loan the remaining members guaranteed, collectively, 18.1%. The guaranty percentages all related to the expected units with which each guarantor would be involved and the amount of equity that was infused.  Notably, the Guarantees totaled 128.09% of the Loan. The Guarantees did not have joint liability. As such, Mutual Bank could not collect more than the limited percentage from any one guarantor.  Because the total Guarantees exceeded 100% of the Loan, if Mutual Bank could recover against all of the guarantors except me it would have realized a recovery of 99.91%.

10.    The loan with Square One was for an eight and half month term which was to mature on December 15, 2008 and provided for payment in full plus accrued interest at 8.5% annually (the "Square One Loan").  In connection with the Square One Loan Team Gowanus

signed a note and subordinate mortgage and I and the other members of Team Gowanus each executed guarantees limited to a specific percentage of the Square One Loan. My parentage of guarantee on the Square One Loan was 28.18%%.

11.     To finance the Project Team Gowanus was seeking construction financing that would replace the purchase money financing and fund the construction.  Unfortunately, due to the extreme economic  downturn in 2008 Team Gowanus was unable to obtain any such financing.  In December 2008, when the Square One Loan came due, Team Gowanus was unable to satisfy the Square One Loan.  Square One threatened to default Team Gowanus under the Square One Loan which would have resulted in a default under the Loan.

12.     On February 23, 2009 I met with Dave Clark ("Clark"), Mutual Bank's Senior Vice President for Special Assets to discuss the situation. I followed up the meeting with an email on February 26, 2009. I explained the threat of default under the Square One Loan and its impact on the Project and the Loan. I made specific note of the fact that Team Gowanus had already gutted the Property and it would take $1,500,000.00 just to make the Property rentable and, in its current condition, was probably unsellable.

13.     In order to save the project and the interests of all parties, including Mutual Bank, which security had severely eroded as result of the economy, I suggested that I would make the payment to Square One for the past due accrued interest of $160,000.00 in return for a reduction of my Guaranty percentage from 28.18% to 7.74%.  I followed with another email on February 27, 2009 noting that reduction in my guaranty would still leave Mutual Bank with guaranties covering more than 100% of the Loan.

(See Exhibit "A" Annexed hereto)

14.     On March 4, 2009 I submitted a formal request to Mutual Bank through Clark. That request was by letter, attached to an email. I advised that I had provided Team Gowanus with sufficient funds to cure the default under the Square One Loan which would also service to get Square One to agree to extend the Square One Loan for five (5) years at a reduced rate of interest. As stated therein:

> The principal purpose of the foregoing transaction was to provide the time and ability to enable Team Gowanus, LLC to pursue our discussions with you looking toward a five year restructuring of the loan agreements with our two mortgage lenders.   In consideration, therefore, you have agreed to amend my guaranty of May 1, 2008 of the obligations of Team Gowanus to Mutual Bank (the "Guaranty") by reducing my maximum liability thereunder to 7.74% of the aggregate amount guaranteed, [ ].  To accomplish this understanding you have agreed to amend the last sentence in the first paragraph of the Guaranty to read as follows: "Notwithstanding the foregoing, Guarantor's maximum liability under the Guaranty is limited to seven and 74/100 percent (7.74%) of the aggregate amount guaranteed." Please confirm your agreement to the amendment of the Guaranty by signing a copy of this letter and returning it to me.

(See Exhibit "A" Annexed hereto)

15.     Apparently the offer was formalized by Hoholik in an internal Mutual Bank proposal to downgrade the Loan and Restructure it along the terms suggested.  I do not recall being asked to provide any updated financial information on any of the guarantors nor do I recall providing same.  Certainly, our collective net worth had decreased sharply. (Exhibit "J" to Aff of Hoholik)

16.     While Mutual Bank did not countersign my letter of March 4, 2009, on March 13, 2009 they accepted the terms of my letter in their letter, signed by Clark and Hoholik, Assistant Vice President Special Assets, stating the following: (Exhibit "M" to Aff of Hoholik)

Mr. Sutter,

This is to advise you that Mutual Bank has approved the following restructure of your loan:

•The bank will reduce your personal guaranty from 28.18% to 7.74%.

•We will remove the cross-default language in the loan documents so that neither section "A" will not [sic] default "B" or "C" and so on.

•The terms will be amended as follows: new 5-year note, interest only at Prime floating, which will be the pay rate, with accrued interest at Prime floating + 2.0%. The accrual rate will be due in full at maturity. However, upon Team Gowanus providing the bank with an acceptable investor at a minimum of $500,000.00, the bank will put a ceiling on the rate and accrual rate of 5.0% through the remainder of the term.

17.     The letter appeared to me to be clear and unequivocal acceptance of my letter dated March 4, 2009 asking for that exact reduction in my personal guaranty as well as the basic provisions of the restructuring.

18.     In order to clarify the specifics of the restructuring, I suggested that the parties describe the primary bullet issues that will need to be part of the restructuring. I presented these in the form of a term sheet. It was around this time that Hoholik, who had been Mutual Bank employee in charge of the Loan, the responsibility was taken over by Joseph Haskett ("Haskett"), who worked out of the New Jersey offices of Mutual Bank. Due to various negotiations, which negations did not vary the very basic framework of the restructuring, the term sheet was finalized on or about May 8, 2009. (the "Term Sheet")  (Exhibit "21" to Aff of Kostyn)

19.     The primary change in the Term Sheet resulted from the very real concern that due to the faltering economy, the value of the Property and Project had been greatly diminished, a fact known to Mutual Bank. Further,  my net worth and those of the other members, had been

severely and negatively affected as well. Moore, who represented the largest Guarantor of the Loan, had almost his entire wealth in highly leveraged real estate ventures, no longer had the assets to satisfy any deficiency judgment. The only way to save the Project and the secure Mutual Bank's financial position was to effectuate the restructuring.  But, it became apparent that even extending the Loan and reducing the interest rate would not have enabled Team Gowanus to attract the required additional capital from new investors and be able to complete the Project and reapply the Loan.  The credit markets had completely locked up at this point, and it was impossible to obtain construction financing.  The Project had to bring in additional investors, and "users."

20.     Consequently, the approved restructuring would not serve its intended purpose, enabling Team Gowanus to complete the Project while satisfying the obligations to booth Team Gowanus and Square One.   Team Gowanus needed to increase the value of the Project and the likelihood that new inverter would enter the project.

21.     In order to bring the value back to the Property and Project and be able to bring in additional investors, Team Gowanus proposed to Mutual bank a division of the Property into smaller, separate tax lots, initially three tax lots, and eventually seven.  This would eliminate or reduce the cross defaults risks for additional investors.  Mutual bank had already agreed to this strategy in their March 13, 2009 letter reducing Sutter's guaranty and agreeing to extend the loan. Doing so would enhance the Property and Project as it would enable each part of the subdivided Property to be used in new ways, eliminating the cross default risks of the each separate component of the Project.   Essentially, the sum of the parts would be greater than the whole.

22.     The Property is unique and lends itself well to a subdivision.  The Property consists of one large four story building, approximately 45,000 Square Feet, and smaller outlying buildings appropriate for town house type development and small commercial studios.  The Project originally planned to create different types of spaces in the different portions of the Property.  However, as the work was put into determine the most viable restructuring plan, and based upon other projects in the area, it seemed best to create different uses for the different lots, whichever best accomplished by the subdivision.  The most valuable portion of the project, the large four story building, was considered for the creation of a luxury boutique hotel.

23.     Further, rather than having to find investors to capitalize a $20,000,000 project, each project could be capitalized independently with substantially less funds and each project could then be sold independently, satisfying its own separate mortgage. The structure benefited both Team Gowanus and Mutual Bank.

24.     In the end, the finalized Term Sheet differed from the initial Term Sheet primarily in that Team Gowanus was subdividing the Property into seven (7) lots instead of three (3) lots and my guaranty to UCB was going to be reduced to 4.2% instead of 7.74.  The Term Sheet was meant to be a basis for drafting the final agreement confirming the rights and obligations of each party.  This Term Sheet did provide that the one binding aspect would be to reduce my Guaranty percentage to 4.2% from 28.18% following my payment to Square One of the accrued interest and the exaction by Square one of the forbearance agreement.  The specific language in the Term Sheet signed by Mutual Bank officer Joe Haskett and Team Gowanus partners, in paragraph 13, states:

> "In order to induce Sutter to make such advance and in consideration of his doing so, Lender agrees to reduce Sutter's Guaranty of the Initial Loan from 28.18% to 4.2%, effective upon

the execution by Gowanus and Square One of a forbearance Agreement in form and substance acceptable to Lender."

The final paragraph of the term sheet further states:

""The foregoing summary of terms sets forth the current basis for negotiations between the parties.  Except for the contemplated change in Sutter's Guaranty under Paragraph 13 which shall be effective upon the limited forbearance of Square One contemplated therein, all the other terms on this term sheet shall be non-binding to either party unless and until substantive agreements between the parties are executed and exchanged."

25.      The "limited forbearance" of Square One was obtained when I made the payment of just under $200,000 to Square One, and as a result, Square One agreed to extend the loan for 5 years at 5%.  Team Gowanus exceeded "limited forbearance" and in fact received a fully extended five year loan. This was accomplished on or about May 1, 2009, making the reduction in my guaranty effective.  While Mutual Bank and I had agreed to this lower 4.2% Guaranty percentage subsequent to the original agreement for a 7.74% Guaranty, if for any reason that 4.2% were to be deemed unenforceable, certainly the earlier agreement would be binding, limiting me to a 7.74% Guaranty. (See Exhibit "B" Annexed hereto)

26.      While the Term Sheet contemplated a more definite writing which would have initiated the performance of the parties, the Loan had already matured and was, in effect, technically non-performing. This was a major concern for Mutual Bank and Haskett.  Rather than start drafting a formal agreement, Hoholik wanted Team Gowanus to start the working on the subdivision, right away and he would effectuate the restructure of the Loan when it was done.

27.      In early May 2009 we began working feverishly to subdivide the Property. This involved the hiring of architects, title companies, expeditors. And attorneys,  all at great time and expense.  During the period May 2009 through September 2009 hundreds of man hours, the

employment of architects, expeditors, attorneys and title professional and well in excess of one hundred thousand dollars were devoted to accomplishing this task.  The work required the drafting of plans, surveys and agreements and submissions were made to the Department of Buildings. Through great effort and force of will, in fact most the work to subdivide the properties was accomplished and the city finally approved the tax lot separations.

(See Exhibits "C-1" and "C-2" Annexed hereto)

28.     The only reason to subdivide the Property was to satisfy the requirements of Mutual Bank that if Team Gowanus did so, the Loan Restructure would be completed.

29.     Of course, at the same time we were working on securing additional investment into the Project. Due to the "credit crunch" customary lender financing was not an alternatives. Especially considering the value of the unfinished Property and the poor financial condition of the guarantors.  However, Moore and I had communications with dozens of potential investors. While many were not interested, we had several that were somewhat interested, but could not even consider such an investment with the Loan in "default"

30.     In an email to Haskett on may 29, 2009 I expressed the difficulty we were having attracting new investors with the Loan showing as in "technical" default. I specifically informed him

> Our Team Gowanus attorney, Howard Weinreich, has had discussions with Wayne Osoba, the Mutual Bank attorney, about the best way to describe this interim period during which we  are working towards a restructuring and refinancing of our existing loan.  Mr. Osoba agreed with our attorney that the best way to pursue this would be to go directly to you with a document along the lines set forth in the Attached.  Could you review this and send us your comments?

(See Exhibit "D" Annexed hereto)

31.    A the suggestion of both Osoba, Mutual Bank's attorney, and HW, Team Gowanus' attorney, I presented him with a proposed short forbearance agreement. Haskett responded:

> Thanks for the suggested amendment. **We prefer to move to closing as soon as possible.** Your accrued interest as of today is $61,985.34. **Please let us know how quickly you will be able to obtain the required mortgage information.** Thx. (emphasis added)

(See Exhibit "E" Annexed hereto)

32.    As is noted by Haskett in his email, he did not reject the forbearance because Mutual Bank was not moving forward with the restructuring. To the contrary, he confided what he had told me before, that Mutual Bank wanted it done, and done quickly. There was not question of "if", but "when" and the sooner the better. So, in accordance with Haskett's direction, and , Team Gowanus did everything it could to complete the subdivision as quickly as possible to "move to closing as soon as possible". Haskett kept close tabs on the progress. (See Exhibit "F" Annexed hereto)

33.    As work continued on the subdivision we continued to have great difficulty in attacking investors due to the "apparent" default status of the Loan. This time I communicated with Hoholik and implored him to speak to Haskett about preparing a forbearance agreement so that investors have something to rely upon. Hoholik directed be pack to Haskett. (See Exhibit "G" Annexed hereto)

34.     In an email provided to us by UCB, Haskett, wrote to Clark.  Haskett confirmed to Clark that he was aware that the only reason I wanted a written document was that Team Gowanus is "**having difficulty finding new investors because our loan appears to be in default**.  He [Sutter] requests we agree to an amendment, attached, that is essentially a forbearance so he can show investors the are not in default."  Haskett then explained to Clark his reasoning in not executing the amendment earlier, stating "**I have resisted allowing any amendment to the Team Gowanus deal because I wanted to keep the pressure on them to make sure the deal closed**".   There is no doubt that Haskett had agreed, on behalf of Mutual Bank that we needed to move forward with the subdivision or he would call a default and that if Team Gowanus accomplished the subdivision the loan would be restructured. (See Exhibit "G" Annexed hereto)

35.     Apparently Haskett and Clark then agreed that the forbearance would be approved and put into the official minutes of Mutual Bank.  This, in fact was done, as noted by the unsigned minuets of the asset committee.

36.     Such was the origin of the document which was negotiated and finally approved by Mutual Bank on July 31, 2009.  This document, as expressed by me in my emails and Haskett, was not a writing to create an agreement, but formalized an oral agreement that had already been made months earlier made necessary to show outside investors.  Mutual Bank and Team Gowanus had already agreed that they would Restructure the Loan after we completed the subdivision. (See Exhibit "H" Annexed hereto)

37.     It must also be noted that Team Gowanus could not accomplish the subdivision without the affirmative assistance of Mutual Bank.  As Mutual Bank was considered an

"interested party" pursuant to the New York City Zoning Law, its consent was required in order to effect the subdivision.

38.     Certainly, as we became aware of the difficulties Mutual Bank was having and the impeding concerns of an FDIC takeover, this created another reason for wanting the forbearance to be in writing.  So that the FDIC or a new bank, not aware of the oral agreement and the performance of the agreement by Team Gowanus, would not honor the agreement.  This, again, was not an issue needing writing to make it binding, but needing a writing to put others on notice of the agreement.  That was made very clear in my correspondence as well.

39.     Just when we were at the end of the subdivision process and the amendment has been finalized, Mutual Bank was taken over by the FDIC.(See Exhibit "I" Annexed hereto)

40.     When we were informed that the Loan had been sold to UCB were unsure as to its position on the agreement to restructure.  We were pleased to find out that that all of the Mutual Bank employees we had been dealing with were now performing those same jobs for UCB. Even further, Osoba, the attorney for Mutual Bank was now representing UCB in connection with the restructure.

41.     While we did not know what to expect, even though the same people were now working for UCB, UCB picked up right where Mutual Bank left off;  signing the amendment so that we could show our investors that the loan was still in good standing.   As far as we were concerned, UCB had simply accepted whatever was agreed upon by Mutual Bank.  We were not informed about any further approval process or any other request necessary to approve the Restructure.  In fact, the only changes that UCB wanted to make were replacing Mutual Bank with UCB as the lender and specifically incorporating the terms of the Term Sheet.

42.     A review of the final revised amendment which was approved for signature by UCB on August 24, 2009 makes clear that Mutual Bank was under an obligation to structured the loan, despite the "non-binding language in the Term Sheet.  The following language was added as paragraph 4 of the Term Sheet.  (Exhibit "G" to Aff of Osoba)

> Acknowledgment of Assumption.   Lender acknowledges that in connection with the acquisition of the assets of Mutual Bank it has assumed the obligations of MG with respect to implementing the Restructure and refinancing contemplated under the Term Sheet. (emphasis added)

43.     UCB has, time and again, taken the position that the Term Sheet is non-binding and therefore Mutual Bank was not bound and had no obligation to Restructure the Loan.  If such were the case, then the language provided in the amendment is incorrect. If UCB and Team Gowanus were negotiating for UCB to agree to carry out the terms  of the "non-binding" Term Sheet by implementation of the amendment, the Term Sheet would simply be incorporated to set forth what UCB would be obligated to do, not that it has assumed the obligation of Mutual Bank, because, according to UCB, Mutual Bank had no obligations.


44.     On August 24, 2009 Osoba, on behalf of UCB, sent HW the final amendment noting that the bank has accepted all comments and to sign and return.  (Exhibit "G" to Aff of Osoba) On August 31,2009 Team Gowanus signed the amendment and returned it, as instructed. We required the return of the amendment signed by UCB, to show investors, and wiring instructions to send the funds necessary to pay the accrued interest.  None  were forthcoming nor was UCB responsive the inquires from its own attorney.  We were given no information from UCB. UCB simply received and accepted the signed amendment, without rejecting it for another month.

45.     It was through my persistence with UCB that I was finally able to find out that Haskett was no longer at UCB and that a new person, Iqbal Lekhani ("IL"), was handling our account. Based upon my communications with him, he knew nothing about this transaction at all. (See Exhibit "J" Annexed hereto)

46.     After providing IL with the information that should have been with UCB, he announced that UCB could not move forward with the transaction as there was insufficient equity.  That was the first time anyone at UCB had suggested anything of the kind.  As far as I was concerned, the deal was done, and agreed and the amendment was simply necessary to show investors.  (See Exhibit "J" Annexed hereto)

47.     Further, for the two (2) months since UCB bought the Loan we had worked toward the Restructure. As noted in the affidavit of Moore, there was significant effort on Team Gowanus' part to implement the plan put in place by the subdivision. Further, I could not understand how, for the first time, the issue of the value of the collateral was raised. The collateral was far below the Loan amount well before UCB took over the Loan.  If UCB never had any intention or ability to move forward with the restructuring, it was wrongful of UCB to make Team Gowanus incur the expense for attorneys, architects and the time and effort put into finalizing the plans for the subdivided Property.

48.     While UCB claims that the approval to move forward with this transaction was only through another loan committee we were never informed of this fact and was assured all along that all approval had been obtained.  In fact, emails produced by UCB have shown that Haskett insisted that he had such approvals.

49.     UCB also argues that, even if the amendment were agreed upon, the restructuring would never have happened as it was conditioned upon each new loan "satisf[ying] lender's

then-current underwriting standards" (Paragraph 2(d) of the amendment) Since the value of the property, in its unimproved state, was well below the necessary loan-to-value required by UCB, it woodnote have met the underwriting guidelines.  Apparently this was put in by Osoba on behalf of Mutual Bank to protect Mutual Bank from a future decrease in value of the collateral. That is why our attorney inserted the following language, which UCB chooses to disregard it in motion, "and provided further that such underrating standards shall not impose on the new companies and their guarantors a higher level of creditworthiness in the aggregate than currently exists as of the date hereof for the Borrower and its guarantors."  As the collateral and guarantees were already well below the existing underwriting guidelines of Mutual Bank, the entire transaction would make no sense to require, in just a few short months, those value to dramatically increase. It would have been a recipe for failure. So it was agreed that Mutual Bank acknowledges the poor status of the Borrower and guarantors, but as long as they do not decrees further, and Team Gowanus and each loan otherwise, meets the guidelines, the restructuring will be implemented.  This was the same condition for UCB in the amendment.

50.    UCB further assumes that Team Gowanus could not have raised more capital by the time the restring were to take place.  In fact, that is not true.  As noted in the affidavit of Moore, he had arranged with a very well respected hotel developer to invest $4,000,000.00 into developing the large building into an hotel.  Further, once a large investor comes in with capital and a  viable plan, other investors are more willing to join the project as well.  In fact, as noted by Moore, the investor sill believes that the hotel development project is viable.  Despite UCB's actions, we feel very confident that Team Gowanus would, have satisfied the restructuring requirements.

51.     I note that UCB makes mention of the fact the Restructure presentation of Mutual Bank dated March 9, 2009 required the lone-to-value of the Puppetry to be 65%, Firstly, the appraisal used by Mutual Bank in that proposal is based upon as fully completed renovation, listing the Property at over $23,000,000.00. Notwithstanding this fact, the original loan was appraised with this same requirement, 65%, yet it did not meet that requirement in its then existing condition, yet the loan was approved.

52.     UCB takes the incredible position that Team Gowanus was aware that there was no binding agreement with UCB because it failed to satisfy the remaining conditions of the term sheet, such as providing a survey and obtaining a title policy. A review of the Term Sheet reveals that those items, and all other reaming items to be provided  by Team Gowanus were due at the closing of the restructuring. All of the other terms of the Term Sheet were related to the method that the new loans and mortgages were to be prepared. Team Gowanus has completed its part, was ready, willing and able to wire the accrued interest and was ready to move to closing as soon as UCB prepared the closing documents, at which time Team Gowanus would, have provided the closing documents noted in the Term Sheet.

53.     At no time did any of my communications, seeking a signed agreement, mean to imply that I thought one was necessary. We had already reached an agreement. I needed as signed agreement to show to investors, as I stressed in several of my emails. Further, after UCB refused to honor its obligations, putting all of my and the rest of them member's equity at risk, I tried to settle this issue with UCB. I was not continuing to negotiate because there was no agreement. I was doing water I could to save my, and the other member's investment.

54.     It is respectfully requested that this Court deny UCB's motion for summary judgment, together with such other and further relief as this court deems just and proper.

PETER MOORE

Sworn to before me this 8th
day of June, 2012

Notary Public

JEFFREY C. RUDERMAN
NOTARY PUBLIC, STATE OF NY
NO. 01-5003389
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXP. FEBRUARY 27