UNITED STATES DISTRICT COURT        **NOT FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
UNITED CENTRAL BANK, successor by :
acquisition to Mutual Bank, :
        :
        Plaintiff, :    **MEMORANDUM & ORDER**
        :
    - against - :
        :    No. 10 CV 3850 (ERK) (VVP)
TEAM GOWANUS, LLC, SQUARE ONE :
HOLDING CORP., PETER MOORE, PETER :
KOVACS, JOHN SUTTER, BEN HANSEN :
ARCHITECT LLC, ENVIRONMENTAL :
CONTROL BOARD OF THE CITY OF NEW :
YORK, "JOHN DOE" #1-10, "MARY DOE" #1- :
10, and "JANE DOE" #1-10, :
        :
        Defendants. :
--------------------------------------------------------- X

KORMAN, J.:

       Plaintiff United Central Bank filed this diversity action for foreclosure pursuant to New

York Real Property Actions and Proceedings Law § 1301 *et seq.* against defendants Team

Gowanus, LLC, Square One Holding Corp., Peter Moore, Peter Kovacs, John Sutter, and several

named and fictitious holders of judgments, liens or other interests in the mortgaged property.

United Central Bank moves for summary judgment on its claims pursuant to Fed. R. Civ. P. 56

and to dismiss the defendants' counterclaims pursuant to Fed. R. Civ. P. 12(b)(6).


**FACTUAL BACKGROUND**

*I.    Team Gowanus Purchased the Property with Loans from Mutual Bank and Square One*

       On or about May 1, 2008, Team Gowanus, LLC ("Team Gowanus") purchased property

located at 68-92 Third Street, Brooklyn, New York, Block: 465, Lot: 12 (the "Property) from

Square One Holding Corp. ("Square One") for $12.5 million. Square One Def. 56.1 Cntrstmnt. ¶

1, ECF No. 56.  There were two sources of funding utilized by Team Gowanus: (1) a $9 million loan from Mutual Bank secured by a mortgage and guaranties of the members of Team Gowanus ("Mutual Bank Note" and "Mutual Bank Mortgage"); and (2) a $2.25 million loan from Square One secured by a purchase money mortgage ("Square One Note").  *Id*. ¶¶ 2-3.

The Mutual Bank Note obligated Team Gowanus to make monthly payments of interest at 8% per annum and to repay the entire principal upon maturity on May 1, 2009.  Pl. 56.1 Stmnt. ¶ 1, ECF No. 50.  The Mutual Bank Mortgage granted Mutual Bank a first-priority security interest in the Property.  *Id*. ¶ 4.  In addition, Messrs. Moore, Kovacs and Sutter individually guaranteed Team Gowanus' loan up to specified percentages of the aggregate amount borrowed (collectively, "Team Gowanus Defendants").  *Id*.  Mr. Sutter's guaranty lists his maximum liability as 28.18%.  *Id*.  In addition, Messrs. Moore, Kovacs and Sutter executed a Commercial Loan Agreement on Team Gowanus' behalf on the date of the purchase.  *Id*. ¶ 6.

The Square One Note obligated Team Gowanus to make monthly payments of interest at 8.5% per annum and to repay the entire principal upon maturity on December 15, 2008.  *Id*. ¶ 8; Square One Def. 56.1 Cntrstmnt. ¶ 4.  The loan by Square One to Team Gowanus was secured by a purchase money mortgage in the amount of $2.25 million, which granted Square One a second-priority security interest in the Property.  Pl. 56.1 Stmnt. ¶ 8; Square One Def. 56.1 Cntrstmnt. ¶¶ 3, 5.  In addition, Messrs. Moore, Kovacs and Sutter guaranteed Team Gowanus' loan.  *Id*. ¶ 6.

II.    *Team Gowanus Negotiated with Mutual Bank and Square One to Restructure the Loans*

From June 1 to December 15, 2008, Team Gowanus failed to make their monthly interest payments in the amount of $15,937.50, as well as late payment charges, to Square One as

required by the Square One Note and Mortgage. *Id*. ¶ 7. On or about December 12, 2008, Team Gowanus requested an extension of the maturity date of the Square One Note, which Square One rejected. *Id*. ¶ 8. On December 15, 2008, the Square One Note and Mortgage matured and the entire principal balance plus interest, costs and fees became due and payable. *Id*. ¶ 9. From that date through May 1, 2009, Team Gowanus and its guarantors did not make any payments toward the principal balance of $2.25 million or any of the accrued interest. *Id*. ¶ 10.

From January through March 2009, Team Gowanus made repeated, but unsuccessful, efforts to enter into a forbearance agreement with Square One. *Id*. ¶ 12. Sometime in March 2009, Mutual Bank learned that Square One was threatening to declare Team Gowanus in default because it had failed to pay $2.25 million in principal and $160,000 in interest that was due to Square One on December 15, 2008. Pl. 56.1 Stmnt. ¶ 27. Such a declaration by Square One would trigger a cross-default on the loan from Mutual Bank. *Id*. ¶ 28. At that time, Mr. Sutter requested that Robert Hoholik, the Mutual Bank loan officer responsible for the bank's relationship with Team Gowanus, consider restructuring the bank's loan to Team Gowanus. *Id*. ¶¶ 25, 28.

On March 9, 2009, Mr. Hoholik drafted and submitted to Mutual Bank's Special Assets Group Committee (the "Committee") a loan presentation which included a proposal to restructure the Team Gowanus loan based on Mr. Sutter's request. *Id*. ¶¶ 28-29. The presentation suggested several conditions precedent to restructuring of the loan, including a restructuring of Square One's loan and a payment of interest arrears to Square One in the amount of $160,000. *Id*. ¶ 30. Furthermore, Mr. Hoholik's presentation included the requirement that any new five-year loan to Team Gowanus satisfy a maximum 65% loan-to-value ratio. *Id*. ¶ 32. The presentation was ultimately signed "Recommended By" Charles Cantro, a Mutual Bank vice

president, and signed "Approved By" David Clark, a Mutual Bank senior vice president. *Id.* ¶ 34. The parties agree that the presentation was not signed by the Team Gowanus Defendants. *Id.* ¶ 34.

On March 13, 2009, a second record of the presentation was created in the form of an unexecuted Minute of the Special Assets Committee Meeting for March 13, 2009 ("the Minute"). *Id.* ¶ 37. The Minute's two signature lines were left blank and the Minute contains no substantive information about the proposed restructuring, but simply states that "[t]he Committee reviewed and approved the following recommendations: Workout Presentations – Restructures . . . Team Gowanus LLC – R. Hoholik." Hoholik Aff., Ex. K. at 1163, ECF No. 48-11, & Ex. L at 277, ECF No. 48-12. After the presentation was approved, Mr. Hoholik sent a letter to Mr. Sutter which included some of the terms for a proposed restructuring. Pl. 56.1 Stmnt. ¶ 40. Soon after, Mutual Bank and Team Gowanus began negotiation of a term sheet. *Id.* ¶ 42.

Also in or about March 2009, Square One entered into negotiations with Team Gowanus regarding a revision of their loan agreement with the intention that it "be part of a global restructuring of the Team Gowanus debt." Square One Def. 56.1 Cntrstmnt. ¶ 13. Team Gowanus communicated to Square One that any restructuring of its debt to Mutual Bank would require, among other conditions, that Team Gowanus restructure its debt to Square One "on the same terms Mutual Bank had proposed for restructuring its loan with Team Gowanus." *Id.* ¶ 15.

On April 6, 2009, Team Gowanus sent its first draft of a term sheet to Mutual Bank. Pl. 56.1 Stmnt. ¶ 44. In the email transmitting the draft, Mr. Sutter wrote to Mutual Bank that Team Gowanus "wanted to take our discussions to the next step and draft up a more detailed term sheet that can be the basis of the modification and extension of the loan." *Id.* This draft of the term

sheet, and all subsequent drafts, contained a provision drafted by Team Gowanus which stated that except for a provision relating to one of the guarantors, "all the other terms in this term sheet shall be non-binding to either party unless and until substantive agreements between the parties are executed and exchanged." *Id.* ¶ 45.

On April 13, 2009, Mr. Sutter emailed Mr. Hoholik with a revised draft of the term sheet and wrote in the accompanying email: "If it does not need any additional comments from you, if you can sign, I will then send it to Square One so they can subscribe to the same restructuring logic." *Id.* ¶ 46. Later that day, Mr. Sutter again emailed Mr. Hoholik urging Mutual Bank "to sign the Term Sheet we sent you Friday today" so that Team Gowanus could work with Square One to restructure the secondary loan and mortgage. *Id.*

On April 15, 2009, Mr. Sutter emailed Mutual Bank to advise that Team Gowanus' attorney was revising a new draft of the term sheet which would separate part of the project into five separate loans with separate tax lots, deeds and personal guaranties. *Id.* ¶ 47. Mr. Sutter again stressed the importance of getting "the term sheet signed" in order to get Square One to "buy into the restructuring." *Id.*

On April 16, 2009, Mr. Sutter emailed Mutual Bank a revised draft term sheet that incorporated the proposed separation of the Property into seven different tax lots and contained several other material alterations from the previous draft, including a proposal that his personal guaranty be reduced from 28.18% to 6.79%, instead of from 28.18% to 7.74%. *Id.* ¶¶ 48-49. Sometime between April 16 and April 20, 2009, Mutual Bank executed this draft of the term sheet and returned it to Team Gowanus. *Id.* ¶ 52.

On April 20, 2009, Mr. Sutter requested that Mutual Bank re-execute the term sheet in light of several typographical errors. *Id*. ¶ 53. Mutual Bank re-executed the term sheet after making the changes that Mr. Sutter had requested and adding a provision specifying certain conditions that must be met prior to closing on any restructuring of the loan. *Id*. ¶ 55. Team Gowanus subsequently executed this term sheet as well. *Id*.

On April 29, 2009, Mr. Sutter requested that the term sheet be further modified. *Id*. ¶ 56. Specifically, Mr. Sutter proposed that his personal guaranty be reduced from 28.18% to 4.20%, instead of 28.18% to 6.79%. *Id*. Mutual Bank executed the revised term sheet to accommodate Mr. Sutter's request. *Id*. ¶ 57.

The final iteration of the Mutual Bank-Team Gowanus Term Sheet ("Term Sheet") was fully executed on or about May 1, 2009. *Id*. ¶ 59. The Term Sheet's first paragraph included a disclaimer that the proposed restructuring was subject to the receipt of financial statements and other underwriting requirements and that ". . . the terms herein are non-binding and are intended solely as a summary of terms currently proposed by the parties." *Id*. ¶ 60. Furthermore, the final paragraph of the Term Sheet included the provision that except for a provision relating to the "contemplated" reduction in Mr. Sutter's personal guaranty, "all the other terms in this term sheet shall be non-binding to either party unless and until substantive agreements between the parties are executed and exchanged." *Id*. ¶ 61.

This final version included additional conditions precedent to the restructuring of Mutual Bank's loan to Team Gowanus. *See id*. ¶¶ 65-67. Specifically, the Term Sheet stated that "[f]unding of the loans referred to in this restructuring is subject to confirmation by Lender of the

net worth and credit standing of each of the New Companies and other credit information submitted to Lender by Gowanus." *Id*. ¶ 65.

The proposed closing did not take place "on our about" May 1, 2009, the date provided in the Term Sheet. *Id*. ¶ 85. In addition, Team Gowanus did not repay the Mutual Bank Note on or before its maturity date of May 1, 2009. *Id*. ¶ 9.

On May 6, 2009, Mr. Sutter notified Mutual Bank that he had wired a $200,000 equity contribution to Team Gowanus to pay interest arrears to Square One. *Id*. ¶ 69.

On or about May 12, 2009, Square One agreed to the terms in the Term Sheet that referenced Square One's loan to Team Gowanus. Square One Def. 56.1 Cntrstmnt. ¶ 18. The Term Sheet made clear that the restructuring of Square One's loan to Team Gowanus was one, but not the sole, condition precedent to "further action" by Mutual Bank. *Id*. ¶ 21. In substance, the Square One Amended Note replaced the Square One Note, reduced the interest rate to 5%, and extended the term of the loan for five years to December 15, 2013. Pl. 56.1 Stmnt. ¶ 74; Square One Def. 56.1 Cntrstmnt. ¶ 22. Simultaneously, Mr. Sutter's guaranty in favor of Square One was also amended, lowering his maximum liability to 4.20% of the total amount owed. Pl. 56.1 Stmnt. ¶ 76; Square One Def. 56.1 Cntrstmnt. ¶ 23.

On May 15, 2009, Team Gowanus transmitted to Mutual Bank a "Written Consent of Members of Team Gowanus" which authorized Team Gowanus to execute the Term Sheet with Mutual Bank and a forbearance agreement with Square One. Pl. 56.1 Stmnt. ¶ 79. However, the Written Consent specified that the members simply approved of the Term Sheet and that the "restructuring prior to closing will be subject to final approval of the Members." *Id*. ¶ 80.

Also on or about May 15, 2009, Team Gowanus paid Square One $178,584.25, representing the interest owed from May 1, 2008 to April 30, 2009. Pl. 56.1 Stmnt. ¶ 73; Square One Def. 56.1 Cntrstmnt. ¶ 26. From May 2009 through June 2010, Team Gowanus made monthly payments of $9,350 to Square One pursuant to the terms of the Square One Amended Note and Mortgage. *Id*. ¶ 27. However, Team Gowanus has not made any payment to Square One since June 2010. *Id*. ¶ 28.

Also on or about May 15, 2009, Mutual Bank sent to Team Gowanus draft loan documents to be used as a starting point for the proposed restructuring, including a draft commercial loan agreement, guaranty, mortgage and security agreement, promissory note, assignment of rents and leases, and environmental indemnity agreement. Pl. 56.1 Stmnt. ¶¶ 83-84. The parties agree that the draft loan documents did not include the material terms of the proposed agreement because they had not yet been discussed or negotiated. *Id*. ¶ 84. Team Gowanus never returned the draft loan documents to Mutual Bank with proposed changes. *Id*.

On or about May 22, 2009, Mutual Bank entered into an agreement with the Federal Reserve Bank of Chicago which required Mutual Bank's parent corporation to submit a plan within two months to replenish depleted capital levels. *Id*. ¶ 86. Importantly, this agreement restricted Mutual Bank's ability to increase any debt without prior written approval of the Federal Reserve. *Id*.

On May 22, 2009, Mr. Sutter wrote to the other members of Team Gowanus via email that he was concerned that Mutual Bank was "in considerable trouble." *Id*. ¶ 89. Mr. Sutter explained that since Team Gowanus was currently in default, a "'distressed lender' who comes

in after Mutual . . . can immediately foreclose on us." *Id*. Thus, he stressed the "need to move quickly and sign onto our new loans to avoid this new risk." *Id*.

On May 29, 2009, Mr. Sutter requested that Mutual Bank agree to a one-page draft amendment to the original Mutual Bank-Team Gowanus loan documents in order to formalize "the interim period during which we are working towards a restructuring and refinancing of our existing loan." *Id*. ¶ 91. The draft amendment proposed that Mutual Bank forbear from treating the loan as in default between May 1 and September 1, 2009, and that Team Gowanus make a payment in the amount of $24,375 to Mutual Bank. *Id*.

On June 23, 2009, Mr. Sutter acknowledged in writing to Mutual Bank that Team Gowanus was "in default since May 1, and I think that this is a defaulted loan on the bank's books," and requested that Mutual Bank reconsider its apparent rejection of the forbearance agreement proposed on May 29, 2009 in order to "take the loan out of the default category for both of us." *Id*. ¶¶ 92-93.

On July 7, 2009, Mr. Sutter requested that Mutual Bank agree to book a single new loan for a five-year term and later convert the loan to seven loans as contemplated in the Term Sheet. *Id*. ¶ 94. On July 9, 2009, Mr. Sutter again requested that Mutual Bank agree to an immediate five-year extension of the existing loan at a reduced rate of interest in order to provide Team Gowanus "with security in the even that Mutual is taken over by the FDIC or a successor banking institution . . . ." *Id*. ¶ 95. Shortly thereafter, Mutual Bank and Team Gowanus entered into negotiations regarding Mr. Sutter's proposal. *Id*. ¶¶ 96-98.

On or about July 31, 2009, Mutual Bank sent a revised draft of the proposed amendment to the Mutual Bank Note and Mortgage, requesting that, if agreeable, Team Gowanus should execute two originals and return them to Mutual Bank "for execution by the bank." *Id.* ¶ 102.

### III. Mutual Bank's Assets Sold to UCB via the FDIC

On July 31, 2009, Mutual Bank was declared insolvent, closed by regulators, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as Receiver. *Id.* ¶¶ 1, 105; Square One Def. 56.1 Cntrstmnt. ¶ 29. On that same day, United Central Bank ("UCB") entered into a Purchase and Assumption Agreement with the FDIC to purchase a portion of Mutual Bank's assets. Pl. 56.1 Stmnt. ¶¶ 1, 106. Among those assets purchased by UCB were the Mutual Bank Note and Mortgage. *Id.* ¶ 1; Square One Def. 56.1 Cntrstmnt. ¶ 29. At that time the Mutual Bank Note and Mortgage was recorded on Mutual Bank's books as a single nonperforming loan in the amount of $8,977,872.40. Pl. 56.1 Stmnt. ¶ 3.

Although Team Gowanus had begun the process of obtaining the necessary signatures to execute the amendment, it was never executed by all of the parties prior to Mutual Bank's takeover by the FDIC. *Id.* ¶ 103. On August 3, 2009, Mr. Sutter continued his efforts to obtain all the signatures required for Team Gowanus to be bound by the amendment. *Id.* ¶ 107. On August 4, 2009, Mr. Sutter wrote to the members of Team Gowanus that he would "discuss signing [the amendment] with the new Texas bank [UCB]." *Id.* ¶ 108.

### IV. Team Gowanus Negotiated with UCB to Restructure the Loan

On the basis of the Term Sheet, Team Gowanus continued negotiations with UCB regarding the potential restructuring. *Id.* ¶ 111; Square One Def. 56.1 Cntrstmnt. ¶ 30. On August 12, 2009, Mr. Sutter wrote to a member of Team Gowanus that the next step was to

"have an interim agreement to sign with the new bank [UCB], and the new bank has indicated a willingness to go ahead and sign the doc." Pl. 56.1 Stmnt. ¶ 113.

On or about August 24, 2009, UCB sent Team Gowanus a draft amendment to the Mutual Bank Note and Mortgage which, among other terms, substituted UCB in place of Mutual Bank and annexed the Term Sheet as an exhibit. *Id*. ¶¶ 114-15; Square One Def. 56.1 Cntrstmnt. ¶ 31. The proposed amendment contained a signature page which provided for the signatures of UCB, Messrs. Moore, Kovacs and Sutter on behalf of Team Gowanus, and Messrs. Moore, Kovacs and Sutter as guarantors. Pl. 56.1 Stmnt. ¶ 116. UCB requested that Team Gowanus "have four originals signed and forwarded . . . for execution by the bank." *Id*. ¶ 134.

On August 26, 2009, UCB was informed that Team Gowanus had obtained "all the necessary signatures from the Borrower and the Guarantors." *Id*. ¶ 139. On September 1, 2009, UCB requested that the originals be sent to UCB so that its attorney could "get the bank to sign." *Id*. ¶ 140. On or about September 3, 2009, Team Gowanus inquired with UCB whether they had executed the amendment. *Id*. ¶ 141. That same day, UCB's attorney wrote to Team Gowanus that he was "pushing to get the amendment signed . . . ." *Id*. There were several other similar communications between UCB and Team Gowanus between September 4 and September 30, 2009, in which Team Gowanus urged UCB to execute the amendment. *See Id*. ¶¶ 142-50.

On October 1, 2009, UCB communicated to Team Gowanus that pursuant to "UCB Policy the loan is already under collateralized, and the restructure of this loan would further jeopardize UCB's current collateral position." *Id*. ¶ 153. In the same communication, a UCB representative notified Team Gowanus that he did "not believe that the Senior Management will approve the restructure of the loan" unless Team Gowanus could pledge additional collateral. *Id*.

Team Gowanus never offered additional collateral to allow UCB to reconsider the proposed restructuring. *Id.* ¶ 154.

Since October 1, 2009, Team Gowanus has not paid New York City real estate taxes on the Property. *Id.* ¶ 13. UCB claims that Team Gowanus' failure to timely pay real estate taxes caused UCB to lose its first-priority lien on the Property and is an event of default under the Mutual Bank Mortgage. *Id.* Defendants dispute this point and argue that Team Gowanus' failure to pay real estate taxes was not a default under the Mutual Bank Mortgage because the "failure was due to UCB's refusal to honor its agreement to forbear and restructure the loan." Square One Def. 56.1 Resp. ¶ 13, ECF No. 54; Gowanus Defs. 56.1 Resp. ¶ 13, ECF No. 68.

V.     *UCB Declared Team Gowanus in Default*

On March 18, 2010, UCB sent a notice of default to the Team Gowanus Defendants via certified mail. Pl. 56.1 Stmnt. ¶ 11. The notice stated that the Team Gowanus Defendants' failure to pay UCB the full amount due on the Mutual Bank Note on or before March 28, 2010, would constitute default. *Id.* ¶ 12. The Team Gowanus Defendants made no payment of principal or interest in that time period. *Id.*

UCB is the current owner of the Mutual Bank Note, Mortgage, Guaranties, Commercial Loan Agreement and other related loan documents. *Id.* ¶ 10. There is no documentary evidence that the amendment to the Mutual Bank Note and Mortgage was ever executed by anyone at UCB. *Id.* ¶ 132.

## PROCEDURAL BACKGROUND

I.      *UCB's Claims Against the Team Gowanus Defendants*

UCB's Amended Complaint sets forth five counts.  Count I alleges that Team Gowanus breached the Mutual Bank Mortgage by causing UCB to lose its first-lien priority through Team Gowanus' failure to pay New York City real estate taxes.  Am. Compl. ¶¶ 47-51, ECF No. 7.  Count II alleges that Team Gowanus breached the Mutual Bank Mortgage by failing to pay and discharge a New York City real estate tax lien on the Property.  *Id*. ¶¶ 52-55.  Count III alleges that Team Gowanus breached the Mutual Bank Note and Mortgage by failing to pay in full all accrued interest and the outstanding principal balance on the maturity date.  *Id*. ¶¶ 56-61.  Count IV alleges that Team Gowanus breached the Mortgage by collecting rents from the Property instead of a receiver.  *Id*. ¶¶ 62-66.  Count V alleges that Team Gowanus and Messrs. Moore, Kovacs and Sutter are liable for the entire indebtedness and that Messrs. Moore, Kovacs and Sutter will remain liable for any debt remaining unsatisfied after a sale of the Property.  *Id*. ¶¶ 67-68.

On the basis of these five counts, UCB requests that the Court enter a judgment that: (1) defendants and others are barred from all estate, right, title, interest, claim, lien or equity of redemption of the Property; (2) the Property may be decreed to be sold in one parcel, and that the monies arising from the sale be brought into Court; (3) UCB be paid the amount due upon the Mutual Bank Note and Mortgage, with interest, expenses and costs, together with any monies advanced and paid pursuant to any term of the Mutual Bank Note or Mortgage, with interest; (4) UCB be awarded reasonable attorneys' fees; (5) Team Gowanus and Messrs. Moore, Kovacs and Sutter be adjudged to pay any deficiency remaining after the application of the sale monies; and (6) the Court appoint a Receiver.  *Id*. ¶¶ A-F.

## II.     The Team Gowanus Defendants' Affirmative Defenses and Counterclaims

In response to UCB's Amended Complaint, the Team Gowanus Defendants set forth fifteen affirmative defenses and counterclaims: (1) failure to state a cause of action upon which relief can be granted; (2) breach of contract; (3) novation, modification or amendment; (4) failure to mitigate damages; (5) equitable estoppel and/or waiver; (6) failure to satisfy a condition precedent; (7) reliance on an agreed-upon loan extension; (8) unclean hands; (9) UCB's lack of standing and/or is an improper party; (10) and (11) breach by Mutual Bank of the purported amendment to the Mutual Bank Note and Mortgage; (12) estoppel from claims arising from the purported Mutual Bank amendment; (13) and (14) breach by UCB of the purported amendment to the Mutual Bank Note and Mortgage; (15) estoppel from claims arising from the purported UCB amendment.  Gowanus Defs. Am. Ans. ¶¶ 69-124, ECF No. 8.

## III.     Square One's Affirmative Defenses and Counterclaims

In response to UCB's Amended Complaint, Square One set forth five affirmative defenses: (1) failure to state a clam upon which relief can be granted; (2) estoppel; (3) waiver; (4) laches; and (5) unclean hands.  Square One Am. Ans. ¶¶ 69-82, ECF No. 10.  In addition, Square One set forth two counterclaims: (1) breach of contract and (2) equitable subordination. *Id.* ¶¶ 83-94.

## IV.     UCB's Response to Counterclaims by the Team Gowanus Defendants and Square One

UCB asserted the same seven affirmative defenses in response to both the Team Gowanus Defendants' and Square One's counterclaims: (1) estoppel due to 12 U.S.C. § 1823(e); (2) parol evidence rule; (3) waiver; (4) unclean hands; (5) statute of frauds; (6) failure to state a cause of action upon which relief can be granted; (7) breach of contract and/or conditions

precedent.  Pl.'s Gowanus Ans. ¶¶ 48-54, ECF No. 11; Pl.'s Square One Ans. ¶¶ 14-20, ECF No. 16.

V.      *UCB's Motion for Summary Judgment and to Dismiss*

On April 25, 2012, UCB filed this motion for summary judgment of foreclosure and to dismiss the Team Gowanus Defendants' and Square One's counterclaims.


**DISCUSSION**

I.      *UCB's Motion for Summary Judgment of Foreclosure*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  And a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

"The burden of demonstrating that no material fact exists lies with the moving party." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (per curiam) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "If the movant satisfies this initial burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of fact exists." *Edsell v. Indep. Freightway, Inc.*, No.

94-CV-227, 1995 WL 375827, at *3 (N.D.N.Y. June 16, 1995) (citing *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir. 1993)), *aff'd*, 101 F.3d 681 (2d Cir. 1996). Summary judgment is mandated, however, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). And, in ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed," *Anderson*, 477 U.S. at 255, and "[a]ll ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam) (citing *Anderson*, 477 U.S. at 255).

"Because of the simplicity of the issues in dispute, 'suits to enforce promissory notes and guarantees are particularly appropriate for disposition by summary judgment.'" *FDIC v. LDM Props., Inc.,* No. 94-CV-5778 (CPS), 1996 WL 449346, at *3 (E.D.N.Y. July 29, 1996) (quoting *FDIC v. Villemarie*, 849 F. Supp. 116, 119 (D. Mass. 1994)). A mortgagee establishes a *prima facie* right to judgment of foreclosure as a matter of law by providing evidence of the mortgage, the note, and defendants' default. *Deutsche Bank Nat'l Trust Co. v. Gordon*, 84 A.D.3d 443, 443-44 (N.Y. App. Div. 2011) (1st Dep't). Once a *prima facie* right to judgment of foreclosure is established, the burden shifts to the defendants to demonstrate, by competent and admissible evidence, the existence of a material issue of disputed fact regarding one or more of their defenses. *CitiFinancial Co. v. McKinney*, 27 A.D.3d 224, 226 (N.Y. App. Div. 2006) (1st Dep't).

*A.      Agreements Between Mutual Bank/UCB and the Team Gowanus Defendants*

The parties agree that UCB and Team Gowanus are bound by the Mutual Bank Note, Mortgage, Guaranties, Commercial Loan Agreement and other related loan documents. However, the parties disagree as to whether other agreements exist between UCB and Team Gowanus that, if binding, may supersede one or more of the original Mutual Bank-Team Gowanus loan documents.  Thus, the threshold issue in this action is whether UCB is bound to the amendment to the Mutual Bank Note and Mortgage and/or an oral agreement requiring it to restructure the loan.  UCB argues that the amendment is not binding because it was never fully executed and that no oral agreement existed.  Pl. Br. at 40-59, ECF No. 51; Pl. Rep. Br. at 32-42, ECF No. 71.  The Team Gowanus Defendants argue the amendment is binding upon UCB because execution was not required and that a binding oral agreement also existed which required restructuring of the loan.  Gowanus Defs. Br. at 6-9, 35-40, ECF No. 67.

Under New York law, "if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed."  *Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970); *see also Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984).  "The determination of whether the parties intended to be bound prior to an executed, written agreement is based on 'the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances' and 'when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent.'"  *Kargo, Inc. v. Pegaso PCS, S.A.*, No. 05 Civ. 10528 (CSH)(DFE), 2008 WL 4579758, at *7 (S.D.N.Y. Oct. 14, 2008) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74-75 (2d Cir. 1984)).  "The mere fact that a written draft is referred to during negotiations has

been held to be some evidence of an intention not to be bound until its execution." *ABC Trading Co. v. Westinghouse Elec. Supply Co.*, 382 F. Supp. 600, 602-03 (E.D.N.Y. 1974) (citing *Banking & Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir. 1958)).

The Second Circuit has identified four factors to aid courts in determining whether parties intended to be bound only after fully approving and executing a formal agreement: "'(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has partial performance of the [alleged] contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the alleged agreement at issue is the type of contract that is usually committed to writing.'" *Kargo*, 2008 WL 4579758, at *22 (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1980)). However, analysis of these factors is unnecessary where the parties' written communications, by themselves, "conclusively establish a mutual intent not to be bound prior to execution of formal documents." *Reprosystem*, 727 F.2d at 262; *see also Jordan Panel Sys. Corp. v. Turner Constr. Co.*, 45 A.D.3d 165, 174 n.5 (N.Y. App. Div. 2007) (1st Dep't).

1.    *Amendment to the Mutual Bank-Team Gowanus Loan Documents*

On July 31, 2009, the negotiations between Mutual Bank and Team Gowanus regarding the amendment to the Mutual Bank Note and Mortgage seemed to come to a conclusion. On that date, Mutual Bank sent a revised draft of the proposed amendment requesting that, if agreeable, Team Gowanus should execute two originals and return them "for execution by the bank." Pl. 56.1 Stmnt. ¶ 102. Before Team Gowanus returned an executed copy of the amendment, in what was perhaps bad timing for Team Gowanus, Mutual Bank was declared insolvent and closed by regulators. *Id.* ¶¶ 1, 105; Square One Def. 56.1 Cntrstmnt. ¶ 29.

Shortly after UCB purchased the Mutual Bank Note and Mortgage from Mutual Bank via the FDIC, Team Gowanus began discussing the draft amendment with UCB. Pl. 56.1 Stmnt. ¶ 111; Square One Def. 56.1 Cntrstmnt. ¶ 30. Although the Team Gowanus Defendants argue otherwise in this action, it is clear from the correspondence at the time that execution of the amendment was a condition precedent to it taking effect. Several examples of such correspondence were provided by the parties: On August 12, 2009, Mr. Sutter wrote to a member of Team Gowanus that he was working to "have an interim agreement to sign with the new bank [UCB], and the new bank has indicated a willingness to go ahead and sign the doc [the amendment]." Pl. 56.1 Stmnt. ¶ 113. On August 26, 2009, Team Gowanus communicated to UCB that it had obtained "all the necessary signatures from the Borrower and Guarantors." *Id*. ¶ 139. And throughout September 2009, Team Gowanus's representative wrote that he was "pushing to get the amendment signed" by UCB and often urged UCB to execute the amendment. *Id*. ¶¶ 141-50. However, UCB never executed the amendment and communicated that it could not do so because the loan was undercollateralized. *Id*. ¶¶ 132, 153.

In addition to these written communications, the Mutual Bank Note, Mortgage and Commercial Loan Agreement all include terms requiring any amendment to be in writing and signed by the parties. Specifically, the Mutual Bank Note contains the following provision: "AMENDMENT. The provisions contained in this Note may not be amended, except through a written amendment which is *signed by Borrower and Bank*." *Id*. ¶ 21 (emphasis added). Similarly, the Mutual Bank Mortgage states:

> NO ORAL CHANGE. This Security Instrument, the Note, and the Other Loan Documents and any provisions hereof or thereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing *signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.*

*Id.* ¶ 23 (emphasis added).  Furthermore, the Commercial Loan Agreement states:

> Amendments.  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and *signed by the party or parties sought to be charged or bound by the alteration or amendment.*

*Id.* ¶ 24 (emphasis added).  These three clauses make it clear that the parties objectively intended for any amendment to be signed by the party charged by the terms thereof.  Moreover, the final draft of the amendment contains a signature page that included signature lines for UCB and Messrs. Moore, Kovacs and Sutter, both on behalf of Team Gowanus and as guarantors,  Osoba Aff., Ex. G at 10, ECF No. 47-7, and there are no terms in the amendment that suggest execution was merely a formality.

In an attempt to avoid the natural result of the written communications between the parties and the binding terms of the Mutual Bank Note, Mortgage and Commercial Loan Agreement, the Team Gowanus Defendants argue that UCB is bound to the amendment "by its own conduct with Team Gowanus."  Gowanus Defs. Br. at 35.  However, in support of their argument the Team Gowanus Defendants point only to inapposite cases and their own subjective views of the status of the negotiations.  The two cases upon which the Team Gowanus Defendants rely are *Matter of Mun. Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144 (1979) and *AIH Acquisition Corp. LLC v. Alaska Indus. Hardware, Inc.*, 306 F. Supp. 2d 455 (S.D.N.Y. 2004).  In *Municipal Consultants & Publishers, Inc.*, the New York Court of Appeals held:

> Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, *in the absence of a positive*

*agreement that it should not be binding until so reduced to writing and formally executed.*

47 N.Y.2d at 149 (citing cases) (emphasis added).  In this action, as discussed above, the parties have at least three positive agreements not to be bound until an amendment is "signed."  *See* Pl. 56.1 Stmnt. ¶¶ 21, 23-24.

*AIH Acquisition Corp.*, which was later vacated and remanded on other grounds, 105 F. App'x 301 (2d Cir. 2004) (summary order), involved a defendant who negotiated and agreed to a contract pursuant to a binding commitment letter that had been signed between the parties, but then refused to sign the contract and offered no explanation or rationale for his behavior.  306 F. Supp. 2d at 455-58.   In concluding that the defendant was bound under the doctrine of promissory estoppel, the Court pointed to the "many, many thousands of dollars of expense . . . for due diligence and financing and lawyers' time spent in reasonable reliance, which would otherwise be lost to one man's caprice, and [the defendant's] lawyers saying more than once that it was not a question of if, but when" the defendant would sign the contract.  *Id*. at 459.  *AIH Acquisition Corp.* is distinguishable from this action on the facts.  Unlike *AIH Acquisition Corp.*, the parties in this action formally agreed in writing that no amendment to the loan documents would be binding until it was fully executed.  Moreover, the time and effort spent negotiating the amendment has not been lost to "one man's caprice," *id.* at 459, but rather to a written UCB policy prohibiting undercollateralization of loans, *see* Pl. 56.1 Stmnt. ¶¶ 152-54.

Although the Team Gowanus Defendants point to UCB's actions in an attempt to establish that the amendment is binding, the actions of the Team Gowanus Defendants are very telling: They continued to negotiate the amendment after the point which they now claim that it became binding upon the parties.  Thus, after the Team Gowanus Defendants had executed the amendment and returned it to UCB, Mr. Sutter requested changes to the document including (1)

an extension of the limited forbearance for an additional two months; and (2) permission to deposit the planned back interest payments in escrow, to be paid to UCB only if the proposed restructuring closed. The Team Gowanus Defendants' ongoing attempts make changes to the amendment are further evidence that the it was not binding until fully executed by the parties. *See Crossland Fed. Sav. Bank ex rel. FDIC v. A. Suna & Co.*, 935 F. Supp. 184. 196-99 (E.D.N.Y. 1995) (holding that continued negotiations between borrower and lender indicated intent not to be bound to proposed amendment).

2.      *Purported Oral Agreement Between Mutual Bank and Team Gowanus*

The Team Gowanus Defendants argue that, even if the amendment is not binding upon UCB, there was a binding oral agreement in place that required UCB to restructure the loan. Gowanus Defs. Br. at 6-9. Specifically, the Team Gowanus Defendants argue that the amendment sent to the Team Gowanus Defendants by Mutual Bank on July 31, 2009, was "simply confirming, in writing, the oral Restructure Agreement that had been reached" by the parties. *Id*. at 6. In an attempt to overcome the explicit agreements between the parties that the loan documents "may not be modified orally" and "require[ed] a modification to be in writing signed by the party against whom enforcement is sought," the Team Gowanus Defendants argue that the doctrines of estoppel and partial performance apply.

New York General Obligations Law § 15-301 provides that "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." A no-oral-modification clause can be overcome by showing either partial performance or equitable

estoppel. *Phoenix Corp. v. U.W. Marx, Inc.*, 64 A.D.3d 967, 968 (N.Y. App. Div. 2009) (3rd Dep't); *see also Baraliu v. Vinya Capital, L.P.*, 765 F. Supp. 2d 289, 297-98 (S.D.N.Y. 2011).

The principal case relied upon by the Team Gowanus Defendants is *Rose v. Spa Realty Associates*, 42 N.Y.2d 338 (1977). The *Rose* Court held that a party to a contract may be equitably estopped from relying upon a clause prohibiting oral modifications when "a party to a written agreement has induced another's significant and substantial reliance on an oral modification." *Id*. at 344 (citing cases). However, the "conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written," *id*. (citation omitted), which is to say that "the conduct asserted to provide the basis for estoppel must be incompatible with the agreement," *Exp.-Imp. Bank of the United States v. Asia Pulp & Paper Co.*, No. 03-CIV-8554 (DCP), 2008 WL 465169, at *4 (S.D.N.Y. Feb. 6, 2008), *aff'd*, 347 F. App'x 672 (2d Cir. 2009) (summary order). "To determine whether the rule of *Rose* is applicable," it is necessary to "consider [the Team Gowanus Defendants'] factual representations regarding the basis for [their] estoppel claim." *Id*.

The Team Gowanus Defendants claim that they would not have taken steps to subdivide the Property into separate lots if Mutual Bank had not suggested that the Team Gowanus Defendants do so. Gowanus Def. Br. at 8-9. Even this representation is accepted as true, however, it is not sufficient to establish an estoppel claim under *Rose* because subdividing the Property was "compatible with the agreement [that is, the Loan Documents] as written." *Rose*, 42 N.Y.2d at 344. Such a change to the Property's legal status did require Mutual Bank's approval, which Team Gowanus had received, *see* Sutter Aff., Ex. C-2 at 1644, ECF No. 64-5, but the change was not at odds with the terms of the original loan documents such that the action would constitute an amendment thereto. *See Asia Pulp & Paper Co.*, 2008 WL 465169, at *4.

More accurately, the steps toward subdivision undertaken by Team Gowanus "are explainable as preliminary steps which contemplate the formulation, in the future, of an agreement." *Gracie Square Realty Corp. v. Choice Realty Corp.*, 305 N.Y. 271, 282 (1953).  As such, Team Gowanus' so-called partial performance is not a basis upon which an oral modification may be found.  *See Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664 (1983) (holding that steps undertaken which contemplated future agreement do not qualify as partial performance); *Chana & Devorah Realty, Inc. v. Degliuomoini*, 25 Misc. 3d 1209(A), 901 N.Y.S.2d 905 (Sup. Ct. 2009) (same).

In sum, neither purported agreement can support the Team Gowanus Defendants' defenses to UCB's motion for summary judgment of foreclosure.

B.      *Mr. Sutter's Guaranty to Mutual Bank/UCB*

In the Mutual Bank-Team Gowanus loan documents, Mr. Sutter's guaranty listed his maximum liability at 28.18% of the aggregate value of the loan.  Pl. 56.1 Stmnt. ¶ 5.  The Team Gowanus Defendants argue that UCB entered into binding agreements to lower Mr. Sutter's guaranty from 28.18% to 7.74% in March 2009 and then to 4.20% in May 2009.  Gowanus Defs. Br. at 10, 25-31.  UCB argues that both alleged agreements are unenforceable under 12 U.S.C. § 1823(e) and the *D'Oench, Duhme* doctrine.  Pl. Br. at 25-39; Pl. Rep. Br. at 19-32.

1.      D'Oench, Duhme *Doctrine and 12 U.S.C. § 1823(e)*

In *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447 (1942), the FDIC sought to enforce a promissory note that it had acquired from a failed bank.  As a defense, the maker of the note argued that the note was given without consideration and was understood to never be called for payment.  *See id*. at 454.  The Supreme Court rejected this defense and held that "one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed

to know that it will conceal the truth from the vigilant eyes of the bank examiners." *Id*. at 460. "[T]he *D'Oench, Duhme* doctrine 'favors the interests of depositors and creditors of a failed bank, who cannot protect themselves . . . over the interests of borrowers, who can." *Inn at Saratoga Assocs. v. FDIC*, 60 F.3d 78, 82 (2d Cir. 1995) (citation omitted). "Since its origin, the *D'Oench, Duhme* doctrine 'has been extended through the development of federal common law to apply to other situations than those involving secret agreements.'" *FDIC v. Suna Assocs., Inc.*, 80 F.3d 681, 684 (2d Cir. 1996) (quoting *FDIC v. Bernstein*, 944 F.2d 101, 108 (2d Cir. 1991)). "Among the assets affected by the *D'Oench, Duhme* doctrine are personal guaranties." *Id*. (citing *Bernstein*, 944 F.2d at 108).

"The *D'Oench, Duhme* doctrine has been codified at 12 U.S.C. § 1823(e)(1)," *id*. at 685, "which protects the FDIC from defenses not apparent on the face of an asset it acquires as receiver of a failed bank," *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). UCB argues that Section 1823(e) bars enforcement of the reduction of Mr. Sutter's guaranty as purportedly agreed to in Mutual Bank's letter of March 13, 2009, and the Term Sheet. Section 1823(e), with limited exceptions not applicable here, reads as follows:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1).

"In essence, this statute prevents parol evidence from altering the rights and obligations of the parties to any notes or other documents of insured institutions that pertain to assets acquired by the FDIC." *Suna Assocs., Inc.*, 80 F.3d at 685. "[A]n agreement that meets the requirements of the statute survives 'even if the [FDIC] did not know of it; and an agreement that does not meet them fails even if the [FDIC] knew.'" *Duraflex Sales & Serv. Corp. v. W.H.E. Mech. Contractors,* 110 F.3d 927, 933 (2d Cir. 1997) (quoting *Langley v. FDIC*, 484 U.S. 86, 95 (1987)). Section 1823(e) is applicable to third-party assignees and transferees of the FDIC, such as UCB in this action. *See Point Developers, Inc. v. FDIC*, 961 F. Supp. 449, 458-59 (E.D.N.Y. 1997) ("Courts have interpreted section 1823(e)(1) to operate as a bar to the subsequent purchaser of such assets."); *Aurora Loan Servs. LLC v. Sadek*, 809 F. Supp. 2d 235, 242 (S.D.N.Y. 2011); *Rankin v. Toberoff*, No. 95 CIV. 10995 (AGS), 1998 WL 370305, at*4 (S.D.N.Y. June 30, 1998).

2.    *Agreement Reducing Mr. Sutter's Guaranty to 4.20%*

On approximately May 15, 2009, two months prior to Mutual Bank's takeover by the FDIC, both parties executed the Term Sheet. *See* Pl. 56.1 Stmnt. ¶ 79. The Term Sheet included a reduction of Mr. Sutter's guaranty as consideration for his impending payment to Square One:

In order to induce Sutter to make such advance and in consideration of his doing so, Lender agrees to reduce Sutter's Guaranty of the Initial Loan from 28.18% to 4.20%, effective upon the execution by Gowanus and Square One of a forbearance agreement in form and substance acceptable to Lender.

Kostyn Aff., Ex. 41 at 2629, ECF No. 46-41. The Term Sheet was non-binding upon Mutual Bank and Team Gowanus. Nevertheless, the parties explicitly agreed to be bound by the reduction in Mr. Sutter's guaranty:

> Except for the contemplated change in Sutter's Guaranty under Paragraph 13 which shall be effective upon the limited forbearance of Square One contemplated therein, all other terms in this term sheet shall be non-binding to either party unless and until substantive agreements between the parties are executed and exchanged.

Kostyn Aff., Ex. 41 at 2630. On the basis of these provisions, Team Gowanus and Square One entered into a forbearance agreement and Mr. Sutter made the proposed payment to Square One. Pl. 56.1 Stmnt. ¶ 73; Square One Def. 56.1 Cntrstmnt. ¶¶ 18, 26. However, UCB argues that this otherwise-enforceable reduction is not binding upon UCB because the Term Sheet fails to meet the requirements of 12 U.S.C. § 1823(e) and the *D'Oench, Duhme* doctrine.

The Team Gowanus Defendants concede that, if Section 1823(e) applies to the Term Sheet, the Term Sheet does not satisfy the requirements of the statute. Gowanus Defs. Br. at 25-26. Thus, the threshold issue is whether it applies to the agreement to reduce the maximum liability of Mr. Sutter's guaranty. The Team Gowanus Defendants argue that this agreement was not one "which tends to diminish . . . the interests of the [FDIC] in any asset acquired by it." *Id*. at 20. This argument has little merit. At the time of the agreement, the reduction of Mr. Sutter's guaranty made it more difficult for UCB to recover on its loan to Team Gowanus in the case that the value of the Property dropped and Team Gowanus failed to pay what it owed to UCB. As is now evident, this is precisely the situation in which the parties now find themselves. Since the reduction of Mr. Sutter's guaranty placed UCB in a more vulnerable position, the agreement was one that "tends to diminish" the UCB's interest in the loan and collateral. Consequently, Section 1823(e) is applicable and the agreement to reduce Mr. Sutter's guaranty, as written in the Term

Sheet, cannot be invoked as a defense against UCB's motion for summary judgment of foreclosure.

3.       *Agreement Reducing Mr. Sutter's Guaranty to 7.74%*

On March 4, 2009, Mr. Sutter sent a letter to Mutual Bank requesting a reduction of his guaranty from 28.18% to 7.74% in consideration for providing Team Gowanus "with sufficient funds to cure any current default under its loan agreement with [Square One] and to extend the Square One loans for five years at a reduced interest rate." Sutter Aff., Ex. A at 626-27, ECF No. 64-1. Specifically, Mr. Sutter requested that Mutual Bank agree "to amend my guaranty of May 1, 2008 . . . by reducing my maximum liability thereunder to 7.74% of the aggregate amount guaranteed." *Id.* On March 13, 2009, Mutual Bank sent a letter (the "March 13 Letter") to Mr. Sutter which stated that, among other things, "Mutual Bank has approved the following restructure of your loan: The bank will reduce your personal guarantee from 28.18% to 7.74%." Hoholik Aff., Ex. M at 1, ECF No. 48-13. This letter was signed by two Mutual Bank executives. *Id.*

The Team Gowanus Defendants argue that the March 13 Letter to Mr. Sutter is binding upon UCB. Gowanus Defs. Br. at 25-31. In response, UCB argues that this purported reduction of Mr. Sutter's guaranty is not binding upon UCB because the March 13 Letter fails to meet the requirements of 12 U.S.C. § 1823(e) and the *D'Oench, Duhme* doctrine. Pl. Rep. Br. at 19-32. For the reasons discussed above, Section 1823(e) is applicable to the March 13 Letter. I turn to the four elements of Section 1823(e) to determine whether the letter satisfies its requirements.

The first element of the statute requires that the agreement be "in writing." 12 U.S.C. § 1823(e)(1)(A). With regard to the March 13 Letter, UCB does not dispute that this element is satisfied. The second element of the statute requires that in addition to a written agreement

between the parties, there must also be "a contemporaneous transfer of an asset – such as a promissory note and any necessary security interests – memorializing a borrower's obligation to a bank." *Inn at Saratoga Assocs. V. FDIC.*, 856 F. Supp. 111, 117 (N.D.N.Y. 1994) (citation omitted), *aff'd*, 60 F.3d 78 (2d Cir. 1995); *see also* 12 U.S.C. § 1823(e)(1)(B). In their attempt to satisfy this requirement, the Team Gowanus Defendants point to the payment that Mr. Sutter made to Square One on May 15, 2009. Nevertheless, there are two reasons why this payment is not "a contemporaneous transfer of an asset." First, the payment was made more than two months – hardly contemporaneously – after the purported agreement was reached between Mr. Sutter and Mutual Bank to reduce Mr. Sutter's guaranty. Second, the payment was made to Square One, not to Mutual Bank, the party against whom the Team Gowanus Defendants seek to enforce the March 13 Letter.

In support of their argument, the Team Gowanus Defendants cite to *Remington Investments, Inc. v. Aidekman*, No. 95 CIV. 1183 (SAS), 1996 WL 417529 (S.D.N.Y. July 25, 1996), and cases from the Eighth and Ninth Circuits. In *Remington Investments, Inc.*, the district judge held that a modification letter satisfied 12 U.S.C. § 1823(e)(1)(B) where the "Defendants agreed to provide the Bank with consideration in the form of mortgages on three . . . properties." *Id*. at *8. Unlike *Remington Investments, Inc.*, in this action there were no assets alleged to have been transferred to Mutual Bank as consideration for the guaranty reduction. Rather, Mr. Sutter made a payment to Square One. Importantly, the statute requires "the acquisition of the asset by the *depository institution*," 12 U.S.C. § 1823(e)(1)(B) (emphasis added), not a third party. Although the cases from the Eighth and Ninth Circuits support a looser interpretation of "contemporaneous," they are unhelpful to the Team Gowanus Defendants because they do not stand for the proposition that consideration paid to a third party satisfies this element. *See FDIC*

*v. Manatt*, 922 F.2d 486, 489 n.4 (8th Cir. 1991) (interpreting "contemporaneous" broadly); *RTC v. Midwest Fed. Sav. Bank*, 36 F.3d 785, 797-98 (9th Cir. 1993) (holding two month gap "contemporaneous"); *see also Remington Invs., Inc.*, 1996 WL 417529, at *8.

Moreover, the March 13 Letter was not executed by any of the Team Gowanus Defendants. *See* Hoholik Aff., Ex. M at 1. Although the Team Gowanus Defendants are correct that two separate signed documents can form a contract, *see* Gowanus Defs. Br. at 26-27, the Second Circuit has strictly applied the "clear" statutory requirement that "the agreement must be 'executed by the depository institution and *any person claiming an adverse interest thereunder*.'" *FDIC v. Giammetti*, 34 F.3d 51, 56 (2d Cir. 1991) (citing *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 384 (11th Cir. 1991)); *see also* 12 U.S.C. § 1823(e)(1)(B). Thus, the second element of Section 1823(e) is not satisfied by the March 13 Letter.

The third element of the statute requires that the agreement be "approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee." 12 U.S.C. § 1823(e)(1)(C). Five days after Mr. Sutter sent Mutual Bank his request to reduce his guaranty, Mr. Hoholik drafted and submitted to Mutual Bank's Special Assets Group Committee a loan presentation regarding a proposed restructuring based on Mr. Sutter's request. Pl. 56.1 Stmnt. ¶¶ 28-29. The loan presentation was ultimately signed "Recommended By" Mr. Cantro and "Approved By" Mr. Clark, both of whom were Mutual Bank executives. *Id*. ¶ 34. The parties agree that the loan presentation was not signed by the Team Gowanus Defendants. *Id*. On the same day the March 13 Letter was sent, a second record of the loan presentation was created in the form of an unexecuted Minute of the Special Assets Committee Meeting for March 13, 2009. *Id*. ¶ 37. The Minute's two signature lines were left blank and the Minute contains no substantive information about the proposed

restructuring, but simply states that "[t]he Committee reviewed and approved the following recommendations: Workout Presentations – Restructures . . . Team Gowanus LLC – R. Hoholik." Hoholik Aff. Ex. K. at 1163, & Ex. L at 277.

The Team Gowanus Defendants argue that the Special Assets Committee's approval of Mr. Hoholik's recommendation and the unsigned Minute satisfy this element. In response, UCB argues that the Minute is too brief and vague to constitute proper documentation of the Committee's actions, regardless of what those actions might have been. The Second Circuit has applied this element of the statute strictly. In *Giammetti*, it held that the fact that an agreement was "part of a group of documents surrounding a transaction does not exempt that agreement from the categorical requirements of 12 U.S.C. § 1823(e) even though the committee of directors referred to the agreement in approving the transaction itself." 34 F.3d at 56-57. As noted above, the Minute is extremely sparse, stating merely that the Committee approved: "Workout Presentations – Restructures . . . Team Gowanus LLC – R. Hoholik." Hoholik Aff. Ex. K. at 1163, & Ex. L at 277. Similar to *Giammetti*, this Minute is properly viewed, at most, as a reference to the agreement but not an explicit approval of the March 13 Letter or any particular terms therein because it lacks sufficient substance. *See Point Developers, Inc.*, 961 F. Supp at 458 (citing cases); *FDIC v. O'Neil*, 809 F.2d 250, 353 (7th Cir. 1987) (agreement referenced in bank's records must be apparent to those not "steeped . . . in the negotiations leading up to the drafting of the agreement"); *Manatt*, 922 F.2d at 488-89 (minutes insufficiently recorded agreement because they "did not recite that the agreement was attached, or set out its terms"). Thus, the third element of Section 1823(e) is not satisfied by the Minute.[1]

---

[1] Since the Minute is substantively insufficient to satisfy 12 U.S.C. § 1823(e)(1)(C), it is unnecessary to reach the significance, if any, of the fact that the Minute was unsigned. In addition, there is no need to address Square One

The fourth element of the statute requires that the agreement must have "been, continuously, from the time of its execution, an official record of the depository institution." 12 U.S.C. § 1823(e)(1)(D). Combined, the parties provided four sentences of argument on this point. *See* Gowanus Defs. Br. at 31; Pl. Rep. Br. at 32. It is unclear based on the lack of evidence and analysis offered by the parties whether the March 13 Letter satisfies this element. Due to the failure to satisfy the second and third elements of the statute, a determination under this element is moot.

II.     *UCB's Motion to Dismiss Square One's Equitable Subordination Counterclaim*

Square One alleges that it is entitled to equitable subordination because Mutual Bank and UCB's "bad acts" induced it "into extending the term of its loan, reducing the rate of interest of its note and amending the guaranty of a guarantor." Square One Def. Br. at 7. In response, UCB has moved to dismiss this counterclaim on the ground that Square One has not provided sufficient evidence or analysis to make out the elements of the counterclaim. Pl. Rep. Br. at 48-52. The factual predicate for this counterclaim is that in or about March 2009, Square One entered into negotiations with Team Gowanus regarding a revision of their loan agreement with the intention that it "be part of a global restructuring of the Team Gowanus debt." Square One Def. 56.1 Cntrstmnt. ¶ 13. Team Gowanus communicated to Square One that any restructuring of its debt to Mutual Bank would require, among other conditions, that Team Gowanus restructure its debt to Square One "on the same terms Mutual Bank had proposed for restructuring its loan with Team Gowanus." *Id.* ¶ 15.

and the Team Gowanus Defendants' arguments for additional discovery regarding the Minute and other Mutual Bank records because the March 13 Letter also fails to satisfy the second element of the statute.

On or about May 12, 2009, Square One agreed to the terms in the Term Sheet that referenced Square One's loan to Team Gowanus. *Id.* ¶ 18. In substance, the Square One Amended Note replaced the Square One Note, reduced the interest rate to 5%, and extended the term of the loan for five years to December 15, 2013. Pl. 56.1 Stmnt. ¶ 74; Square One Def. 56.1 Cntrstmnt. ¶ 22. Simultaneously, Mr. Sutter's guaranty in favor of Square One was also amended, lowering his maximum liability to 4.20% of the total amount owed. Pl. 56.1 Stmnt. ¶ 76; Square One Def. 56.1 Cntrstmnt. ¶ 23. Nevertheless, the Term Sheet made clear that the restructuring of Square One's loan to Team Gowanus was one, but not the sole, condition precedent to "further action" by Mutual Bank. *Id.* ¶ 21. Subsequently, Mutual Bank continued negotiating the terms of a restructuring of its loan to Team Gowanus. On July 31, 2009, a proposed amendment to the Mutual Bank Note and Mortgage was transmitted to Team Gowanus. Pl. 56.1 Stmnt. ¶ 102. Unfortunately for Team Gowanus and Square One, Mutual Bank was put into receivership by regulators on that same day, before either party executed the agreement. *Id.* ¶¶ 1, 103, 105; Square One Def. 56.1 Cntrstmnt. ¶ 29.

These allegations do not constitute a basis for equitable subordination, which is primarily a bankruptcy doctrine. *See United States v. Noland*, 517 U.S. 535 (1996); *In re AppliedTheory Corp.*, 493 F.3d 82 (2d Cir. 2007); *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 852 (E.D.N.Y. 1995) ("A claim for equitable subordination must be brought by an adversary proceeding in the Bankruptcy Court."); *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011). "'Under the doctrine of equitable subordination . . . a bankruptcy court may subordinate a particular claim if it finds that the creditor's claim [ ], while not lacking a lawful basis nonetheless results from inequitable behavior on the part of that creditor.'" *In re Enron Corp.*, 379 B.R. 425, 432-33 (S.D.N.Y. 2007) (quoting *Musso v. Ostashko*, 468 F.3d 99, 109 (2d Cir. 2006)); *see also*

*People's United Bank v. Wetherill Assocs.*, No. HHD096005763, 2011 WL 383740, at *7 (Conn. Sup. Ct. Jan. 4, 2011) (containing a thoughtful discussion of equitable subordination).

Moreover, even if the doctrine of equitable subordination is applicable here, the allegations in the counterclaim do not provide any basis to invoke it. *See In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008) ("Equitable subordination is an extraordinary remedy that is to be used sparingly.") (citation omitted), *aff'd*, No. 09 CIV. 1636 (PKC), 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009); *see also People's United Bank*, 2011 WL 383740, at *7. The equitable subordination counterclaim does not allege facts constituting "inequitable conduct" on the part of Mutual Bank/UCB. *See* Square One Am. Ans. ¶¶ 89-94. Indeed, that counterclaim does not even allege a cause of action for breach of contract and Square One has forfeited its counterclaim for breach of contract, *see id.* ¶¶ 83-88, because it failed to respond to UCB's motion to dismiss that counterclaim. Thus, Square One's counterclaim for equitable subordination is dismissed. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## CONCLUSION

UCB's motion for summary judgment of foreclosure is granted and the Team Gowanus Defendants' and Square One's counterclaims are dismissed.

SO ORDERED.

Brooklyn, New York
November 14, 2012

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge